UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEBRASKA
OMAHA DIVISION

KATRINA A. ZINNER, as Trustee for the
Zinner Family Trust, on her own
Behalf, and on behalf of those
similarly situated, and CHRISTA
ZINNER, on her own behalf and on
behalf of those similarly situated,

                    Plaintiffs,

vs.                                                    CASE NO:

SECURITIES AMERICA,
SECURITIES AMERICA FINANCIAL
CORPORATION, AMERIPRISE FINANCIAL,
INC.,

                    Defendants.
_____/

## CLASS ACTION COMPLAINT

NOW Comes Plaintiffs Katrina Zinner and Christa Zinner (collectively, "Zinner") and bring this class action lawsuit under the Securities Act of Nebraska and Nebraska common law.

1.      Zinner's basis for federal subject-matter jurisdiction is the Class Action Fairness Act ("CAFA").

2.      This class action arises in the wake of a national debacle wrought by Defendants, which a recent enforcement action by the Massachusetts Securities Division revealed with a detailed administrative complaint, *In the matter of Securities America*, Docket No. 2009-0085 (Mass., filed Jan. 26, 2009) (attached hereto as Exhibit A) (cited as "Mass. Complaint ¶ --").

3.     The Massachusetts Complaint revealed that, for five years, Securities America utterly ignored warnings from due diligence advisors about the grave dangers posed by selling promissory notes issued by special purpose corporations ("SPC"), wholly owned by Medical Capital Holdings, Inc. ("MCHI").

4.     Rejecting those warnings, Securities America sold over $680 million in Med Cap notes in what turned out to be a $2.0 billion Ponzi scheme.

5.     Today, $358 million of those notes are in default; the United States Securities & Exchange Commission has filed a civil action against Med Cap and its officials; a receiver has been appointed to recover assets; and, most recently, Massachusetts Securities Division deposed from officials from Defendant Securities America's due diligence committee and reviewed hundreds of documents that Securities America produced.  That culminated in the Massachusetts Complaint and its revealing a shocking course of conduct by Defendants that has left investors like Zenner with crippling losses.

6.     These tragic events explain why many key players on Securities America's due diligence committee have either retired or left the company, *e.g.*, Thomas Cross (Due Diligence Committee Chairman), retired, and Jay Idt has left the company.

7.   Recently, Securities America answered the Massachusetts Complaint by wrongly arguing, among other things, that Securities America was nothing more than a broker-dealer.

8.   By any measure, Securities America acted as an "underwriter," as Title 48 Nebraska Administrative Code, Chapter 002.22B (2008), defines "underwriter," and is thus as responsible as is Med Cap for the gross omissions in Med Cap offering materials.

9.   Zinner brings this putative class action under the Securities Act of Nebraska ("SAN"), Neb. Rev. Stat. §§ 8-1101 *et seq.*, and Nebraska common law against Defendant Securities America, Securities America Financial Corporation ("SAFC"), and Ameriprise Financial, Inc. ("Ameriprise"), on her own behalf and for all others similarly situated, by their undersigned counsel, and make the following allegations based upon the following: (i) her personal knowledge; (ii) information and belief; (iii) the investigation of her counsel, which included review of publicly available documents, including pleadings filed by the United States Securities & Exchange Commission ("S.E.C."); (iv) reports filed by court-appointed S.E.C. receiver Thomas A. Seaman; and (v) offering documents, including those filed by Medical Provider Financial Corporation II ("Med Cap II"), Medical Provider Financial Corporation IV ("Med Cap IV"), Medical Provider Funding Corporation V ("Med Cap V"), Private Placement Memoranda ("PPM"), and the Administrative Complaint filed by the Massachusetts Securities Division, along with its exhibits.

This is primarily an omissions case.

## BACKGROUND

10.   This putative class action arose when, under the control of Defendants Securities America Financial Corporation ("SAFC") and Ameriprise Financial ("Ameriprise"), Defendant Securities America acted as a statutory underwriter that offered and sold $697 million dollars worth of securities for issuer Med Cap – a company that turned out to be a $2 billion Ponzi scheme that spawned an SEC civil action against Med Cap and a Massachusetts enforcement action against Securities America.

11.   Defendant Securities America distributed, offered, and sold Med Cap II, IV, and V notes even though due diligence advisors repeatedly warned Securities America that Med Cap PPMs were misleading and that additional information was required to be disclosed so as not to mislead Securities America customers.   Securities America did not care; instead, in favor of millions in commissions and fees, Securities America ignored the truth, which is that the medical receivables company's accounting records and practices pointed strongly towards the existence of a Ponzi scheme.   In so doing, Securities America violated Nebraska law.

12.   Non-party MCHI is a Nevada corporation, with its principal place of business in Tustin, California.   Through various wholly owned operating subsidiaries and Special Purpose Corporations ("SPC's"), MCHI purported to finance healthcare providers by purchasing the providers' accounts receivables and making secured loans to those providers.   MCHI used the SPC's to raise money from investors like Zinner and putative class members.

13.   MCHI used the operating subsidiaries to monitor, administer, and service the receivables financings.   MCHI is not registered with the S.E.C. in any capacity.

14.   Medical Capital Corporation, Inc. ("Med Cap") is a Nevada corporation and MCHI's wholly-owned subsidiary, with its principal place of business in Tustin, California.   Med Cap administers each of MCHI's SPC's, including Med Cap II, IV, and V.

15.   Med Cap II is Nevada corporation and MCHI's wholly-owned subsidiary. According to the S.E.C.'s civil complaint against MCHI, Med Cap II was formed in October 2003 and from January 2004 through December 2005, sold $251 million in

promissory notes to approximately 3,458 investors.  Of the $251 million sold, about $88 million remains outstanding and in default.

16.   Med Cap IV is a Nevada corporation and MCHI's wholly-owned subsidiary. According to the Amended 10-Day Report and Accounting of Receiver (the "Receiver's Report") filed in the S.E.C.'s action against Med Cap IV, which is divided into two series, received funds from investors totaling approximately $407 million.  According to the same Receiver's Report, as of June 30, 2009, Med Cap IV had approximately $401 million in outstanding notes.

17.   Med Cap V is a Nevada Corporation and MCHI's wholly owned subsidiary. According to the Receiver's Report, Med Cap V received funds from investors totaling approximately $403 million.  Further, according to the Receiver's Report, as of June 30, 2009, MP V had approximately $401 million in outstanding notes.  The S.E.C. receiver has discovered and reported that Med Cap's records show at least 301 instances of accounts receivables being transferred between Med Cap entities for $829 million.

18.   Importantly, aging receivables oftentimes were sold from one succeeding Med Cap entity to another, and the older the receivables got, the more each Med Cap entity would pay for those receivables – an absolute contradiction to the common sense notion that, like a loaf of bread, receivables become less (not more) valuable as they grow stale.

## NATURE OF ACTION

19.   This is a putative class action filed on behalf of all persons and entities who: (a) from about January 1, 2004 until December 31, 2005 (the "Med Cap II Class Period), purchased or acquired notes or other securities issued by Med Cap II through a

purportedly private placement offering (the "Med Cap II Offering") that were offered and sold through public promotions, solicitations made by Defendant Securities America; (b) from about April 20, 2007 until July 31, 2008 (the "Med Cap IV Class Period"), purchased or acquired notes or other securities issued by Med Cap IV through a purportedly private placement offering (the "Med Cap IV Offering") that were offered and sold through public promotions, solicitations, or offers made by Defendant Securities America; (c) from about November 21, 2007 until July 31, 2008 (the "Med Cap V Class Period"), purchased or acquired notes or other securities issued by Med Cap V through a purportedly private placement offering (the "Med Cap V Offering") that was offered and sold through public promotions, solicitations, or offers made by Defendant Securities America.

20.    On or about January 28, 2004, Med Cap II filed with the S.E.C. a Form D Notice of Sale of Securities, seeking exemption from federal registration requirements otherwise imposed by § 5(a) and § 5(c) of The Securities Act of 1933  ("Securities Act") of 1933 ("Securities Act"), 15 U.S.C. § 77e(a), (c) (2008) for $250 million in Med Cap II notes.  Defendant Securities America is listed on that Form D Notice.  *See* Exhibit B (Med Cap II's Form D Filing).

21.    On or about April 20, 2007 and May 18, 2007, Med Cap IV filed with the S.E.C. two separate Form D Notices of Sale of Securities, seeking exemptions from federal registration requirements otherwise imposed by § 5(a) and § 5(c) of the Securities Act for $250 million in Med Cap IV notes.  Defendant Securities America is listed on that Form D Notice.  *See* Exhibit C (Med Cap IV's Form D filings).

22.     On or about November 21, 2007, Med Cap V filed with the S.E.C. a Form D Notice of Sale of Securities, seeking an exemption from federal registration requirements otherwise imposed by § 5(a) and § 5(c) of The Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e(a), (c) (2008), for $400 million in Med Cap V notes. Defendant Securities America is listed on that Form D Notice. *See* Exhibit D (Med Cap V's Form D filing).

23.     Beginning in or around January 2004, a network of broker-dealers that included Defendant Securities America publicly solicited, offered, and sold promissory notes, purportedly exempt from federal and state registration, for issuer Med Cap II. Beginning in or around April 2007, a network of broker-dealers, that included Defendant Securities America, publicly solicited, offered, and sold securities, *i.e.*, notes, purportedly exempt from federal and state registration, for issuer Med Cap IV.  In so doing, these broker-dealers acted as statutory underwriters.  And beginning in or around November 2007, a network of broker-dealers that included Defendant Securities America publicly solicited, offered, and sold securities, *i.e.*, notes, purportedly exempt from federal and state registration, for issuer Med Cap V.

### VENUE

24.     Venue is proper in this District under 28 U.S.C. § 1391(a)(1), (2).

### JURISDICTION

25.     This court possesses subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) & (d)(1) (2008).

## PARTIES

26.   Plaintiffs and putative class representatives Katrina Zinner and Christa Zinner live and reside in Pacific Palisades, California.   At all times material to this complaint, Zinner was a customer of Defendant Securities America, and Defendant Securities America sold Zinner one note issued by Med Cap II, for $255,000; one note issued by Med Cap IV for $258,000; and one note issued by Med Cap V for $255,000.

27.   Defendant Securities America is a Delaware corporation, which maintains its principal offices and headquarters at 12325 Port Grace Blvd., La Vista, Nebraska 68128.  Securities America is a wholly-owned subsidiary of Defendant SAFC, which is a wholly owned subsidiary of Defendant Ameriprise.

28.   Defendant SAFC is a Nebraska corporation and maintains its principal offices at 7100 West Center Road, Suite 500, Omaha, Nebraska 68106.  SAFC serves as the holding company for Defendant Securities America.   According to Defendant Securities America's report on file with the Financial Industry Regulatory Authority ("FINRA"), SAFC directly owns seventy-five percent or more of Defendant Securities America, and more importantly, according to that same report, SAFC "direct[s] the management or policies of [Securities America]."   Additionally, several of SAFC's officers also serve as Securities America's officers, *e.g.*, Steven F. McWhorter, a Nebraska resident, serves as SAFC's President *and* as Securities America's Chairman and Chief Executive Officer ("CEO").  McWhorter received many e-mails regarding the due diligence warnings.  Yet McWhorter did nothing.  Worse still, McWhorter approved Securities America's selling Med Cap notes even in the face of repeated warnings from due diligence advisors.

29.    Defendant Ameriprise is a Delaware corporation, which maintains its principal offices located at 1099 Ameriprise Financial Center, Minneapolis, MN  55474. Ameriprise wholly owns Defendant SAFC, and thus, also Defendant Securities America. Defendant Securities America's report on file with FINRA confirms this; that report identifies Defendant Ameriprise as Securities America's "indirect owner."  More importantly, that FINRA report contains the following question:  "Does this owner [*i.e.*, Ameriprise] direct the management or policies of the firm [*i.e.*, Securities America]?" The answer:  "Yes."  Finally, Ameriprise's Chief Financial Officer ("CFO"), Walter S. Berman, also serves as a director for Securities America, and according to the FINRA report, Berman directs the management or policies of Defendant Securities America. Upon information and belief, Berman approved and controlled the misconduct of Securities America's due diligence committee.

## FACTS

30.    Since December 2003, MCHI has raised about approximately $2 billion from more than 20,000 investors by selling those investors notes issued by SPC's, including Med Cap II, IV, and V.

31.    During the summer of 2009, however, the S.E.C. stepped in and sued MCHI, and Med Cap VI to stop Med Cap VI's offering because the S.E.C. concluded Med Cap VI's PPM contained material misstatements about prior SPC's defaults on payments and material omissions.  The S.E.C. accused MCHI, Med Cap, and others of operating a Ponzi scheme.  Convinced that the S.E.C.'s allegations were meritorious and likely to succeed, Judge David Carter granted the S.E.C. injunctive relief, appointed a receiver, and denied Med Cap's request to file bankruptcy.

32.   The receiver's reports, as well as the Massachusetts Complaint, detail a vast and long-running financial scam, where adherence to any defensible accounting rules and practices can nowhere be found.  The receiver's reports, along with other evidence, led the federal court to appoint a permanent receiver, freeze assets, and conclude that "[g]ood cause exists to believe that defendants MCHI, Med Cap, and Med Cap VI . . . have engaged in . . . practices and courses of business that constitute violations of [the anti-fraud provisions of the federal securities laws]."  The receiver's report makes clear that, as far back as early 2004, various Med Cap entities, called Medical Provider Financial or Funding Corporation, numbered I, II, III, IV, V, and VI, and other Med Cap entities were engaged in outright fraud.

33.   The Massachusetts Complaint shows that, as far back as 2003, Securities America's due diligence advisors, including Omaha law firm Mick & Associates repeatedly warned about the risks associated with Med Cap promissory notes.

34.   Armed with Mick & Associate's due diligence reports, Securities America should have come to appreciate that Med Cap likely was a Ponzi scheme.  But, engaging in willful blindness, and Securities America failed to disclose to its brokers, its customers like Zinner and the putative class members that Securities America was selling securities that Securities America knew or, absent deliberate recklessness, should have known were part and parcel of a massive fraud.

35.   From 2003 to 2008, Mick & Associates generated most of the due diligence reports which, in most instances, were given to Securities America prior to Securities America's selling and distributing Med Cap promissory notes.  Plaintiffs say "in most instances" because in the first few offerings that Securities America undertook for Med

Cap, Securities America sold Med Cap before Securities America ever received any due diligence report.

36.   In at least three offerings, (Calmont Capital II; Med Cap I; Med Cap II; and Med Cap III), Securities America allowed its brokers to start selling Med Cap before Securities America received any due diligence report at all.  (Exhibit A at 28, ¶¶ 102, 103).

37.   During deposition testimony before the Massachusetts Securities Division, Securities America's Head of Sales and Due Diligence Committee Chairman, Thomas Cross, who has left Securities America in the wake of the Med Cap debacle,that Securities America relied most heavily on the due diligence reports.  Yet Securities America's due diligence committee, the committee that Cross chaired, actually ignored and failed to alert Securities America's customers and brokers of the risk issues contained within the due diligence reports from 2003 until 2008.

38.   Further, Securities America failed to address any of the recommendations raised by due diligence analyst and purposely chose to withhold the actual reports from its own brokers and from its customers, against all advice from Mick & Associates.

39.   In each of the due diligence reports, Mick & Associates raised several material risks.  Securities America failed to take reasonable steps to address these material risks with Med Cap, or to disclose to investors these risks.  Instead, Securities America blindly accepted whatever explanation Med Cap provided, even though in one instance, Securities America's due diligence advisor characterized Med Cap's explanations as "BS," *i.e.*, bulls**t.

40.   Securities America omitted to disclose to its brokers and customers that Mick & Associates had identified and warned about a number of material risks.  Further, even after Mick & Associates strongly recommended that Securities America disclose these risks to Securities America customers, Securities America refused.

41.   For example, in 2003, Securities America had in its possession financial income statements from Med Cap, but omitted to disclose those statements, or information contained in those statements, to Securities America brokers and customers.

42.   In 2004, Mick & Associates raised the same concerns that Mick & Associates had raised in its 2003 due diligence report.   Again, however, Securities America approved Securities America's selling Med Cap promissory notes to investors without disclosing to its brokers or investors risks identified by third-party due diligence advisors.  Further, Securities America did so without demanding that Med Cap amend or alter its PPMs to include risk disclosures urged by Mick & Associates.   Instead, Securities America circulated those misleading PPMs to Securities America brokers and investors.

43.   In 2005, Mick & Associates highlighted its grave concerns over Med Cap's lack of audited financials and apparent reluctance to engage an independent auditing firm to conduct an audit and produce such financials.   Specifically, Med Cap stated values for its receivables that were never verified by any sort of independent audit. Against Mick & Associates' strong advice, Securities America accepted Med Cap's unverified valuations of receivables.  Additionally, Med Cap officials reneged on their promise to personally certify Med Cap's collateral coverage ratio and other financial information—another material fact Securities America failed to disclose to investors.

44.    In January 2005, Securities America due diligence advisor RTA Financial Analysis, L.L.C. ("RTA"), warned Securities America that Med Cap "may use some of the offering proceeds to pay interest [or] repay principal" – the classic tell-tale sign of a Ponzi scheme. *See* Exhibit E (RTA's Due Diligence Report). Yet Securities America failed to so warn its brokers or its customers. Instead, Securities America circulated Med Cap PPMs that contained false and misleading omissions detailed herein, including the omission to disclose RTA's prescient warning.

45.    Even Securities America's own due diligence committee member, Jim Nagengast, who was deposed by the Massachusetts Securities Division, voiced his strong concerns in a February 15, 2005 e-mail to Thomas Cross, Securities America's due diligence committee chair:

> My **big concern is the audited financials.** At this point there is no excuse for not having audited financials . . . it is a cost they simply have to bear to offer product through our channel.
>
> We may simply have to tell them have to tell them that if they don't have financials by XXXX date we will stop distributing the product on that date. They can decide if that is worth spending $50,000 to have it done. If they don't want to spend the money, **that should give us concerns.**

Exhibit F (E-mail from J. Nagengast, dated Feb. 15, 2005) (emphasis added).

46.    That same e-mail chain, started by Thomas Cross, referred to a "completed report" and asked Nagengast to pay "particular attention to the final bullets on page three." (Exhibit E). That completed report, dated January 21, 2005, was prepared by RTA.

47.   RTA's "Screeing Report" warned of "serious concerns," which Securities America cast aside in favor of lucrative commissions for publicly offering, distributing, and selling Med Cap promissory notes in what was purported to be a private placement:

> The two-year operating history provided in [Med Cap's] financials shows a growing and profitable entity.  **However, because they are not audited financial statements, we cannot rely on them.  Moreover, [Med Cap's] $8.3 million in equity is probably a bit on the low side for the level of business it conducts.**
>
> *                    *                    *                    *
>
> **Although we specifically asked for information on the Performance of [MedCap's] prior offerings, *none was provided*.  Therefore, we are *unable to determine what kind of returns they have achieved for their investors*.**
>
> *                    *                    *                    *
>
> **While we feel that the offerings warrant further review, *we have serious concerns:***
>
> • **_The most critical factor is that the Company may use some of the offering proceeds to pay interest, repay principal_, and/or pay commissions.**
>
> *                    *                    *                    *
>
> • **Holdings does not have audited financial statements And has limited financial history *and no prior performance information was provided.*  This information will be critical if a full research report is to be done.**

(Exhibit E) (RTA Screening Report, dated January 21, 2005) (emphasis added). Securities America circulated Med Cap PPMs without disclosing any of the above material information.

14

48.   Given RTA's January 2005 warning to Securities America, no later than January 2005, Securities America was on notice about what indeed proved to the "[t]he most critical factor," the tell-tale sign of a Ponzi scheme, "that [MedCap] may use some of the offering proceeds to pay interest [and] repay principal[.]"  (Exhibit E).  Despite this ominous warning, Securities America never ensured that MedCap was not, in fact, using offering proceeds to pay interest.  Nor did Securities America refuse to continue selling Med Cap notes.

49.   Nagengast's February 15, 2005 e-mail was not the first time Nagengast had voiced concerns about Med Cap's lack of audited financials.  In July 2004, Nagengast noted not only Med Cap's lack of audited financials, but he pointed out that "[s]ince [Securities America is] a big enough distributor it would not be unreasonable for [SA] to demand that [Med Cap] complete a full audit to the coming year if they haven't done so." (Exhibit G) (E-mail from J. Nagengast, dated July 26, 2004).

50.   This admission by Nagengast that Securities America is a "distributor" further supports the inescapable conclusion that, in fact and law, Securities America was acting as an "underwriter," as defined in Title 48 Nebraska Administrative Code, Chapter 002.22B (2008).

51.   At the beginning of Nagengast's July 26, 2004 e-mail trail, Securities America official David Spinar noted that NASD (n/k/a FINRA0 "expressed concern that Med Cap didn't have audited financial statements."  (Exhibit G).   Still, Securities America proceeded to sell Med Cap notes.

52.   Despite Securities America's power to demand a Med Cap audit, Securities America never did so.  Instead, Securities America acted against the strong advice and concerns of Mick & Associates and RTA, as well as its own due diligence committee and continued selling Med Cap notes.

53.   From 2005 until 2007, the warnings in Mick & Associates' due diligence reports increased dramatically.  In the "Conclusions & Recommendations" section, Mick & Associates raised the same issues as they did in 2003 and 2004.  Additionally, beginning in 2005, Mick & Associates identified a number of material risks associated with Securities America's customers' investing in Med Cap promissory notes.

54.   Regarding Med Cap IV, Mick & Associates recommended (and Securities America cast aside) the following:

> [Securities America] should **strongly consider that prospective investors review and acknowledge receipt of this report to understand the material risks associated with [Med Cap] IV** as compared to prior [Med Cap] offerings, including:
>
> 1.   The Note Agreement **does not require a sinking fund** for payment of the notes or require the maintenance of any particular financial ratios to better ensue future repayment of the Notes.
>
> 2.   The ability to invest up to $50 [million] in equity securities of all types of business and make mortgage loans to receivables sellers or other parties in health care industry, outside of [Med Cap's] core expertise, and **Inadequate PPM disclosures regarding** mortgage Financing, conflicts of interest as dual lender and commercial real estate risks;
>
> 3.   No independent directors, especially given the myriad of related and conflicted transactions and contractual relationships by and among the Company, [Med Cap], [MCHI] and Meditrack;

4.      The [Med Cap] executives Mr. Field and Mr. Lampariello, **have not agreed to personally certify** monthly net collateral coverage with individual indemnity directly to note holders;

5.      A diluted Note Agreement with Wells [Fargo], including lack of disbursing agent function, a higher 50% threshold for note holders to enforce remedies, and the general lack of responsibility and oversight that was incorporated in prior offering [Med Cap III];

6.      Given the burgeoning size and presence of [Med Cap] and the special purpose entities and the dollars involved, **use of a local CPA firm rather than one of the nationals;** and

7.      The ability of [Med Cap] IV to purchase receivables that are [older] than 180 days, **which is inconsistent with [Med Cap's] prior strategic approach** of buying quality insurance company and government receivables, which "turn" every 90 days.

Exhibit H (Mick & Associates' Due Diligence Reports for Med Cap III, IV, and V).

55.    Securities America, however, omitted to disclose any of these warnings and risks to either its brokers, or its customers.  Instead, Securities America circulated Med Cap's PPMs and offering materials that omitted these risks and warnings.  Even Jim Nagengast of Securities America had stated in a July 2004 e-mail that, given the amount Med Cap promissory notes that Securities America was selling, that it would not be unreasonable to demand Med Cap undertake an audit.  Further, Securities America likely possessed the power to demand that Med Cap include these risks and warnings in Med Cap's PPM, or to simply stop distributing and selling Med Cap notes.  But Securities America did neither.

56.    Further, Securities America absolutely possessed the power to not circulate Med Cap PPMs that made such material omissions.  Yet, for the sake of lucrative commissions, Securities America circulated Med Cap's PPMs to investors, knowing full

well that those PPMs contained material omissions regarding the matters set forth in paragraph 54, *supra.*, Securities America circulated Med Cap's PPMs.

57.    In 2006, Mick & Associates created for Securities America a "Client Disclosure Form," attached there to as Exhibit I.  That form disclosed six of the seven risks identified in paragraph 54, supra.  Mick & Associates urged Securities America to send the form to Securities America customers to ensure that Securities America customers purchasing Med Cap notes fully appreciate the increasing risk that came with buying Med Cap notes.  But Securities America refused.

58.    Instead, Securities America circulated a document called the "Placement Agent Certification," attached hereto as Exhibit J, which said that, "prior to the [customer's] executing [the] subscription agreement, [Securities America] has informed the [customer] of . . . all pertinent facts relating to an investment in the notes, including the risk factors disclosed in the memorandum."  (Exhibit J).

59.    The Placement Agent Certification omitted to disclose "all pertinent facts," including those risks identified in paragraph 54, supra., as well as failing to disclose or provide the "Client Disclosure Form," urged by Mick & Associates.

60.    Med Cap responded to the issues raised in the Client Disclosure Form. Mick & Associates characterized Med Cap's response as "BS" and so informed Jay Idt at Securities America.  (Exhibit K) (E-mail dated Nov. 15, 2006 to Jay Idt).

61.    Jay Idt then forwarded this e-mail to Thomas Cross at Securities America. Idt told Cross that Mick & Associates "wanted [Med Cap] to makes some changes regarding the questions on the disclosure form and Med Cap would not."  Idt continued that "this offering is the same as the last without any changes [Mick & Associates]

suggested." Idt noted that Mick & Associates "stressed to [Securities America] to use this [Client Disclosure Form] with clients[.]" Then, Idt warned his Securities America colleagues, "this is confidential . . . and not to be shared." (Exhibit K) (E-mail dated Nov. 16, 2006, forwarded to Brian Crockett and Tom Cross at Securities America).

62. On October 17, 2006, Mick & Associates sent Securities America an e-mail warning about Med Cap V. At least one lawyer at Mick & Associates, Bradford A. Updike, who formerly served as in-house counsel at Securities America, was cc'd on the e-mail. The e-mail warned that Mick & Associates' "review [of Med Cap V] will be done in a couple of weeks and **unless [Med Cap] fix[es] some structural issues lingering from [Med Cap IV] our review will not be favorable**." (Exhibit L) (E-mail dated Oct. 17, 2006 to Brian Crocket at Securities America).

63. In a November 3, 2006 e-mail, Mick & Associates challenged Med Cap's responses to the Client Disclosure Form and forwarded that to Jay Idt at Securities America:

> Fred, I disagree with every point and nothing in [MedCap] IV has changed structurally. It is very *unfortunate* that you have the ability to enhance this offering but see fit to peel off the cash every month. For $250 million if [Bank of New York] wants to do nothing in its capacity that doesn't prevent you from appointing an independent audit person or firm to accomplish oversight for investors. Nothing similarly prohibits you from leaving some cash in a sinking fund to provide an extra measure of security. [Joseph J. Lampariello, MCHI President] told me last time [*i.e.*, Med Cap III] that either he or [Sidney M. Field, MCHI's CEO] would personally certify the [collateral coverage ratio] at 1:1 or better every month; I even drafted a certification to use which was never implemented. I could go on and on but if you guys figure "the money keeps rolling in, why do anything?", then that's certainly your business decision. Thanks,

(Exhibit M) (E-mail, dated Nov. 3, 2006 and forwarded to Jay Idt at Securities America

on Nov. 15, 2006).

64.     On November 30, 2006, Mick & Associates raised the alert level (and show

its frustration with Securities America's years of inaction) with the following e-mail

direct to Securities America, warning about Med Cap IV:

> As I stated to both of you, none of the recommended
> changes from [MedCap] III were implemented . . .
> ***It also appears that [MedCap's] consolidated financials
> have downgraded a bit.*** **IF** you decided to approve, please
> do so with restrictions on percentage of net worth, liquid
> and non-liquid, no reinvestment of interest, capping
> future note principal reinvestment to note proceeds from
> redemption or even a reduced percentage. ***Frankly, I am
> upset that an organization bringing in these dollars
> cannot agree to a partial sinking fund and appointment
> of an independent overseer as BNY doesn't commit to
> doing anything . . .***

(Exhibit N) (E-mail, dated Nov. 30, 2006 from Mick & Associates to Jay Idt at

Securities America).

65.     Despite all of these warnings—for years—and despite obvious heightened

concern about the lack of adequate risk disclosures and audited financials for Med Cap,

Brian Cockett at Securities America sought approval from Securities America's due

diligence committee and wanted to get "the agreement [with Med Cap] signed and out

the door today" for Med Cap IV.  (Exhibit O) (E-mail, dated Dec. 1, 2006 from Brian

Crocket to Securities America's due diligence committee).

66.     Eventually, Securities America's brokers started asking for due diligence

reports on Med Cap.  Securities America, however, refused.  Securities America did so

because, according to Tom Cross' deposition testimony before the Massachusetts

Securities Division, having those reports fall into investors' hands would "just be a bad

thing."   (Exhibit A at 13) (Massachusetts Complaint) (quoting Cross' deposition

testimony).

67.   When the inevitable happened, *i.e.*, when Med Cap starting having trouble redeeming its promissory notes, Securities America's Thomas Cross wrote the classic self-serving e-mail:

> **This is beyond alarming to us.   Please see if you can find out what is going on and what we can do on behalf of our clients.   I honestly fear a panicked run on the bank . . . if [this] is true.**

68.   But Securities America apparently was not all that alarmed because as Zinner has alleged, and as documents attached to the Massachusetts Complaint show, Securities America sold Med Cap notes for years and despite warnings from Securities America's own due diligence advisors, Mick & Associates and RTA.   Securities America became "alarmed" only when Med Cap started to collapse—the sum of all fears and risks that Mick & Associates and RTA had heralded in due diligence reports since 2003.  And as documents the S.E.C. Receiver filed, Securities America sold at least one Med Cap VI note—long after Cross wrote this e-mail.

69.   The warning signs were present at Med Cap and the various MP entities almost from the beginning, were identified by Mick & Associates and RTA who, in turn, repeatedly warned Securities America that much more was required in the way of disclosures to clients.   Securities America did nothing.   Instead, Securities America circulated Med Cap's PPMs to Securities America brokers and customers knowing full that those PPMs failed to adequately warn of the serious and increasing risks in Med Cap promissory notes. And now, investors like Zinner and the putative class members here face the prospect of losing hundreds of millions of dollars.

70.   MCHI's, Med Cap's, and the SPC's financial statements did not comply with Generally Accepted Accounting Principles ("GAAP") — actually, the financial statements, to the extent they even existed, contained gross violations of GAAP, violations that bespoke fraud by the MP's and that betrayed Securities America's deliberate recklessness in detecting, but not disclosing, any of the numerous red flags of fraud that were flying high over Med Cap and the various SPC entities like Med Cap II, IV, and V.  Securities America ignored, and failed to disclose to investors, these red flags because Securities America was earning huge commissions for its distributing, offering, and selling Med Cap notes.

71.   Nor did MCHI, Med Cap, or the SPC's like Med II, IV, and V keep their accounting records in a way that would allow GAAP-compliant financial statements to be generated—another ominous warning sign that Securities America either detected and omitted to disclose or did not detect because Securities America obviously turned a blind eye to every warning Securities America's due diligence team offered for years.

72.   In addition to the many disclosure deficiencies that Mick & Associates identified and urged Securities America to correct, the warning signs also included accounting practices that would have shamed even Bernard Madoff.  As Jay Idt noted in one e-mail, Securities America should have demanded an independent audit, given Securities America's serving as a major distributor of Med Cap promissory notes. Securities America never did because Securities America likely knew the outcome of an independent audit would preclude Securities America from selling Med Cap notes.

73.   According to the receiver's report, MCHI's, and Med Cap's accounting hijinx included the following, all of which Securities America failed to detect and

disclose because Securities America flouted its obligations under FINRA Notice to Members 03-71:

    a.    Generally, MCHI's and Med Cap's financial records and accountings are unreliable because the records did not comply with GAAP and because of fraudulent practices as inflated and overstated values on collateral, receivables, and the long-eschewed fraudulent accounting practice of "round-tripping;"[1]

    b.    At least 301 separate incidents of suspected "round-tripping," amounting to over **$829 million** in sales of assets from one MCHI entity to another—301 incidents that Securities America would have discovered had Securities America demanded that Med Cap undertake an independent audit;

    c.    Med Cap III's valuing purported collateral Trace Life Sciences at $30 million when Trace Life Sciences was a defunct entity earning no money at all, and unable to pay its bills;

    d.    Trace Life Science's using Med Cap III's own line of credit to pay interest to Med Cap III;

    e.    Med Cap IV valued purported collateral Legacy Medical Center in Georgia at $40 million when, astonishingly, Legacy had been foreclosed on and was not even in operation;

    f.    In July 2007, Med Cap IV paid $18.5 million for receivables that originated with Advanced Radiology, a medical care provider, before 2004, when Med Cap I paid $14.9 million for the receivables from Carlmont Capital II, a MCHI entity that pre-dated all of the Med Cap SPC's—between April 2004 and July 2007, Med Cap I received no payments on this receivable, and yet, over three years later, MCHI valued these stale receivables for $3.6 million more than was paid for them initially;[2]

---

[1] "Round-tripping" is the fraudulent accounting practice of related entities selling the asset to one another over and again, and each time they do, the value of that asset is unjustifiably inflated, thereby skewing the entities' financial statements.

[2] This accounting practice not only violates GAAP, it defies common sense. Receivables do not increase in value as they age; rather, they decrease in value. Yet no due diligence by Securities America caught these gross examples of inflated values and "round-tripping" even though, upon information and belief, Med Cap note sales provided Securities America a large part of Securities America's sales commissions during the Class Period.

g.    Then, in October 2008, Med Cap IV sold these same Advanced Radiology receivables from 2004 to Med Cap VI for $20.5 million, an increase of $2 million even though, at that point, the receivables were over four years old and had not been collected on for years—this accounting violated MCHI's own agreements with trustees and others;

h.    In March 2006, Med Cap II paid medical provider Monsour Medical $547,955 for certain receivables.  By May 2006, Med Cap II had collected $339,299 on those receivables, reducing the balance to $235,656.   During 2007, Med Cap II apparently collected no more money on the Monsour receivables.  ***Then, in May 2007, Med Cap II sold the $235,656 in Monsour receivables to Med Cap III for $430,613***;

i.    But MCHI was not done with Monsour receivables; in August 2008, Med Cap III sold the Monsour receivables to Med Cap IV for $599,569, which was $363,913 **more** than the outstanding balance on those receivables—and yet, Securities America forewent demanding Med Cap engage an independent audit that would have uncovered this and similar gross over-valuations and "round-tripping;"

j.    In January 2004, Med Cap I paid an earlier MCHI entity, Carlmont Capital II, $3.222 million for medical receivables from provider NLV, Inc.  For the next 3 ½ years, it appears, no collections were made on the NLV receivables.  Then in August 2007, Med Cap IV paid MPFC I $3.72 million for NLV receivables that were, by then, over three years old—and yet, Securities America omitted to disclose this, and Securities America forewent demanding Med Cap engage an independent audit that would have likely uncovered this and similar gross over-valuations and "round-tripping;"

k.    MCHI was not done with the NLV receivables, however.   In January 2008, Med Cap IV sold the then-four year old NLV receivables to Med Cap V for $3.8 million—Securities America omitted to disclose this, and Securities America forewent demanding Med Cap engage an independent audit that would have likely uncovered this and similar gross over-valuations and "round-tripping;

l.    Astonishingly, MCHI round-tripped the NLV receivables one more time, and for still more than Med Cap V paid for them.  In August 2008, Med Cap VI paid Med Cap V $4.2 million for these now-ancient uncollectible receivables.  Still more astonishing is this:

*On July 2, 2009, Med Cap sent NLV a collection letter, stating an unpaid balance of just $154,222 on the NLV receivables that MPFC VI had just paid over $4 million to purchase from Med Cap V*—Securities America omitted to disclose this, and Securities America forewent demanding Med Cap engage an independent audit that would have likely uncovered this and similar gross over-valuations and "round-tripping;"

m.   On June 30, 2009, Med Cap VI listed the value of NLV receivables as $4,154,222—exactly $4 million more than the unpaid balance that Med Cap would seek to collect from NLV just two days later—and yet, even though sale of Med Cap notes provided Securities America with a large part of Securities America's commissions revenue, Securities America omitted to disclose this, and Securities America forewent demanding Med Cap engage an independent audit that would have likely uncovered this and similar gross over-valuations and "round-tripping;;

n.   In May 2004, Med Cap I paid Carlmont Capital II, a MCHI entity, $2.5 million for receivables from medical provider Total Family Care. For the next three years, apparently, Med Cap I made no collections on this $2.5 million receivable, and yet, in August 2007, Med Cap I sold the then-three year old Total Family receivables to Med Cap IV for $3.84 million, $1.3 million more than Med Cap I paid for those receivables three years before. Securities America omitted to disclose this, and Securities America forewent demanding Med Cap engage an independent audit that would have likely uncovered this and similar accounting irregularities at Med Cap;

o.   But Med Cap was not done with the Total Family receivables; Med Cap wanted one last "round trip" out this now-ancient, stale, and uncollectible set of receivables. So, in August 2008, Med Cap IV sold the then-four year old Total Family receivables to Med Cap VI for $4.4 million, or $1.9 million more than Med Cap I paid for those receivables in May 2004—again, Securities America omitted to disclose this, and Securities America forewent demanding Med Cap engage an independent audit that would have likely uncovered this and similar gross over-valuations and "round-tripping, but the S.E.C.'s receiver uncovered it in less than two weeks' of investigating;

p.   After Total Family's last "round trip" with Med Cap VI, Med Cap VI, in October 2008, then increased the valuation it assigned to Total Family's receivables from the $4.4 million paid to an astounding $6.4 million, or $3.9 million more than Med Cap I had

paid for those receivables more than four years earlier—and again, upon information and belief, the fact that Med Cap Notes were generating huge commissions for Securities America caused Securities America to forego any disclosures beyond those risk disclosures made in Med Cap's PPMs, even though Securities America's own due diligence advisors identified facts showing that the PPM's risk disclosures omitted to disclose numerous material risks.

74. In sum, according the SEC's receiver, Med Cap's records indicate that "at least some of the receivables purchased by newer Med Cap's did not actually exist at the time of purchase."

75. Additionally, "the accounts receivable were overstated," and "[i]t is common sense that receivables lose value as they age." Securities America omitted to disclose this, and Securities America forewent demanding Med Cap engage an independent audit that would have likely uncovered this.

76.   In addition to the flagrant accounting irregularities detailed above, Med Cap also lacked any sort of internal controls. For example, Med Cap made a number of undisclosed and questionable investments far afield from medical receivables. These investments included:

a.  $6.9 million mobile phone application, with a company called Vivavision, which MCHI principal Joseph Lampariello ("Lampariello") "handled personally," without any oversight by MCHI Vice President and General Counsel Thomas Fazio ("Fazio"). According to Fazio, Lampariello forbade Fazio from trying to collect this $6.9 million for MCHI;

b.  Another mobile phone application with a company called Single Touch Initiative for about $5.4 million, again Lampariello personally controlled this matter;

c.  A $20 million investment in an unknown, unreleased film, The Perfect Game (a film purportedly of a Mexican baseball team winning a championship game); and,

      d.  Ownership of a 118-foot yacht, called "Home Stretch," moored in Newport Beach, California.

Securities America omitted to disclose this accounting hijinx, which Securities America either knew or should have known, had Securities America taken advice from Mick & Associates and its own Jay Idt:  force Med Cap to engage an independent auditing firm or stop selling Med Cap notes.

      77.    Securities America's due diligence, learned about some or all of the above red flags, but Securities America recklessly failed to warn its brokers or investors about the accounting chicanery and utter lack of internal controls at MCHI and Med Cap. Thus, no investor could know about the true degree of risk that came with buying Med Cap II, IV, or V notes.

      78.    Consequently, Zinner and the putative class members face severe financial losses because Securities America turned a blind eye toward (and failed to warn its brokers or its customers about) the panoply of red flags and warning signs apparent from the due diligence that Securities America possessed, as well as Med Cap's "BS" responses to Mick & Associates' proffered Client Disclosure Form; and Lamapriello's and Field's broken promise to personally certify Med Cap's collateral coverage ratio; and Med Cap's refusal to engage an independent audit to confirm Med Cap's self-stated financials and collateral coverage ratio.

      79.    Finally, Securities America circulated (and thus, communicated) to investors material omissions made in MCHI's, Med Cap's, and Med Cap's PPM for the Med Cap II, IV, and V notes.  Those materially misleading omissions included:

      a.    That neither MCHI's nor Med Cap accounting practices complied with GAAP — that alone should've prompted warnings from Securities America to the Class, but it did not;

b.  Securities America circulated to investors Med Cap PPM's that omitted to disclose that when a Med Cap entity purchased a batch of receivables, that Med Cap entity recorded as revenue the amount by which expected collections exceeded purchase price, but that Med Cap entity never reconciled actual collections with expected collections, and thus, never corrected the recorded revenue — importantly, upon information and belief, Securities America never inquired or verified the Med Cap entities' basis for determining what expected collections might be on any given set of receivables;

c.  Securities America circulated, and thus, communicated to Zinner the material omission that neither MCHI nor the Med Cap entities put aside adequate reserves for uncollectibility on any given set of receivables — importantly, upon information and belief, Securities America never inquired or verified during any due diligence whether any reserves were set aside for uncollectibility in any given set of receivables;

d.  The risks identified, and disclosures urged, by Securities America's due diligence advisors; and

e.  The risks identified and warned of by Jay Idt.

80. Yet, for the sake of lucrative commissions, Securities America rejected warnings provided it by Securities America's own due diligence advisors—warnings that strongly pointed to Med Cap's fraud, fraud that was easily identified when the S.E.C. receiver undertook a review in the few days leading up to the Receiver's Report, wherein much of the information above can now be found.

81. Notwithstanding investors' right to be fully and fairly informed of material risks regarding Med Cap II's, Med Cap IV's, Med Cap V's, and Med Cap's financial stability and non-GAAP compliant accounting—and, notwithstanding what Securities America said in the Placement Agent Certification—Securities America recklessly recommended, promoted, offered, distributed, and sold Med Cap II, IV, and V to investors like Zinner.  Securities America sold Zinner the following:

| Investment | Amount | Purchaser | Date |
|---|---|---|---|
| Medical Provider Funding Corp. II | $255,000 | Zinner Family Trust | 10/27/05 |
| Medical Provider Funding Corp. IV | $258,000 | Christa Zinner | 2/7/07 |
| Medical Provider Funding Corp. V | $255,000 | Christa Zinner | 4/25/08 |

82.     At present, Zinner and the putative class have sustained substantial losses in the Med Cap II, IV, and V notes, which obviously are now worthless.

## CLASS ALLEGATIONS

83.     Plaintiffs bring this action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

84.     This is a putative class action, filed on behalf of all persons and entities to whom Defendant Securities America publicly offered, distributed, and sold notes issued by Med Cap II, IV, and V.

85.     The putative class satisfies Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure regarding numerosity, typicality, commonality, superiority, and adequacy.

86.     Excluded from the putative class are the Defendants, Defendants' directors and officers, immediate families of Defendants' directors and officers, and any entity in which the Defendants maintained a controlling interest, or that is related to or affiliated with the Defendants, or the legal representatives, agents, affiliates, heirs, successors-in-interests or assignees of any such excluded person.

87.     The members of the putative class are so numerous that joinder of all members would be impracticable.   Zinner estimates the number of putative class

members to be several thousand, according to papers recently filed by the S.E.C. Receiver. The precise number of putative class members can easily be ascertained from Securities America's records. Notice can be provided to class members using first-class mail, published notice, and, where possible, electronic mail.

88.     Zinner will fairly and adequately represent the putative class. Plaintiffs have retained counsel experienced in sophisticated securities class action litigation.

89.  Zinner's claims are typical of all putative class members' claims because Zinner's and all putative class members' damages stem from: (i) the same material omissions in PPMs issued by Med Cap II, IV, and V and circulated to Zinner and putative class members by Securities America; (ii) the same recklessness, *i.e.*, Securities America's abject failure to disclose what Securities America's due diligence advisors revealed to Securities America, which was that Med Cap II, IV, and V were flawed as described in this Complaint, the S.E.C. Receiver's Reports, and in the Massachusetts Complaint. This caused Zinner and putative class members to suffer great financial harm.

90.     A class action is superior to other available methods for the fair and efficient means to resolve this controversy. The damages suffered by individual class members may be relatively small, however, the expense and burden of individual cases for such putative class members make it quite difficult for individual class members to seek redress against Securities America for the misconduct identified in this putative class action complaint. Zinner knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

91.    Common questions of law and fact exist as to all putative class members and predominate over questions affecting individual putative class members.  Among the questions of law and fact common to the putative class are:

a.  Whether Securities America agreed with MCHI or Med Cap to distribute Med Cap promissory notes, and thus, whether Securities America acted as an "underwriter," as Title 48 Nebraska Administrative Code, Chapter 002.22B defines "underwriter";

b.  Whether Securities America violated § 8-1102(1)(b) of the Securities Act of Nebraska by failing to state material facts necessary in order to make the statements made in Med Cap PPMs, in the light of circumstances under which they were made, not misleading, when Securities America circulated Med Cap II's, Med Cap IV's, and Med Cap V's PPMs to Zinner and the putative class;

c.  Whether Securities America violated § 8-1102(1)(c) of the Securities Act of Nebraska by making omissions of material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, when Securities America circulated to its brokers Med Cap promotional materials, knowing its brokers would disseminated those materials to investors, but at the same time, withheld from its brokers and customers the ample warnings of Securities America's due diligence advisors;

d.  Whether Defendants SAFC and/or Amerprise violated § 8-1118(3) of the Securities Act of Nebraska because either or both directly or indirectly controlled Defendant Securities America;

e.  Whether Securities America knew, and in the exercise of reasonable care could (and should) have known, of the untrue statements and misleading omissions in PPMs issued by Med Cap II, IV, and V and circulated by Securities America;

f.  Whether Securities America was negligent or reckless in its rejecting advice from Securities America's due diligence advisors regarding Med Cap II, IV, and V, and whether this negligence or recklessness damaged the putative class;

g.  Whether Securities America was negligent in failing to adhere to the mandates or guidance provided by FINRA in Notice to Members 03-71;

h.  Whether    Securities    America    stands    liable    of    negligent

misrepresentation for the misstatements and omissions it conveyed to Zinner and to the putative class; and

i.   Whether, and to what extent, Zinner and the putative class were damaged by Securities America's conduct.

## COUNT ONE—VIOLATION OF §8-1102(1)(b) of the
## SECURITIES ACT OF NEBRASKA

### Against Defendant Securities America, Inc. only

92. Zinner incorporates here by reference the allegations made in paragraphs through 91, as if fully here alleged.

93. Securities America here acted as an "underwriter," as Nebraska's Administrative Code defines that term.   Indeed, Nagengast characterized Securities America's role as one of the largest distributors of Med Cap notes.

94. Securities America publicly distributed, offered, and sold promissory notes issued by Med Cap II, IV, and V via materially misleading PPMs.

95. Securities America publicly distributed, offered, and sold securities issued by Med Cap II, IV, and V via misleading omissions contained in the PPMs that Securities America disseminated to its brokers and investors.   The omissions were all substantially similar, and are identified herein.

96. In so doing, Securities America acted with scienter, a state of mind which can be averred generally.

97. Zinner and the putative class members justifiably relied on the PPMs circulated by Securities America and upon other omissions made by Securities America; in fact, the PPMs purported to limit investor reliance to what the PPMs said. Alternatively, reliance may be presumed here given the existence of a common scheme perpetrated upon all class members.

98. Securities America's materially misleading omissions caused Zinner and the putative class members to purchase securities issued by Med Cap II, IV, and V.

99. When the truth about Med Cap II, IV, and V came out, the Zinner's and putative class members' investments in Med Cap II, IV, and V notes became worthless.

## COUNT TWO—VIOLATION OF OF § 8-1102(1)(c) of the SECURITIES ACT OF NEBRASKA

### Against Defendant Securities America only.

100.    Zinner incorporates here by reference the allegations made in paragraphs 1 through 91, as if fully here alleged.

101.    Securities America violated § 8-1102(1)(c) of the Securities Act of Nebraska in that Securities America circulated to its brokers Med Cap promotional materials and PPMs, all the while withholding material risks repeatedly highlighted by due diligence advisors Mick & Associates and RTA, knowing that its brokers would disseminate these materials to investors.

102.    In so doing, Securities America used advertising and sales presentations in a deceptive and misleading manner because the information sent to investors omitted material risk information.   Securities America's Tom Cross testified that giving such information to brokers and investors would "be a bad thing."  This conduct violated § 8-1102(1)(c). *See* 48 Nebraska Administrative Code, Chapter 12.002.02.

## COUNT THREE—VIOLATION OF, AND LIABILITY UNDER, § 8-1118(3) SECURITIES ACT OF NEBRASKA

### Against Defendants Securities America Financial Corporation and Ameriprise Financial, Inc.

103.    Zinner incorporates here by reference the allegations made in paragraphs 1 through 91, as if fully here alleged.

104.    As alleged herein, Defendant Securities America violated the Securities Act of Nebraska.

105.    As alleged herein, and as admitted in FINRA reports, Defendants SAFC and Ameriprise either directly (in SAFC's case) or indirectly (in Ameriprise's case) control Securities America, and stand liable for Securities America's violating §§ 8-1102(1)(b), (c) of the Securities Act of Nebraska.

106.    Both Defendant SAFC and Defendant Ameriprise stand liable as control persons under the Securities Act of Nebraska because both materially aided Securities America in Securities America's violating the Securities Act of Nebraska.

107.    Both SAFC and Ameriprise materially aided Securities America in that both directed the management and policies of Securities America, including the policies and actions of Securities America's due diligence committee, whose failings and misconduct lie at the heart of this case.

### COUNT THREE—NEGLIGENCE

### Against Defendant Securities America, Inc. only

108.    Zinner incorporates here by reference the allegations made in paragraphs 1 through 91, as if fully here alleged.

34

109.    Securities America bore a duty and breached a duty to Zinner and all members of the putative class to conduct adequate due diligence into Med Cap II, IV, and V before publicly promoting, offering, and selling notes issued by those entities.

110.    Omaha law firm Mick & Associates and RTA performed due diligence on each Med Cap entity and provided Securities America with a due diligence report on each SPC.  Those reports warned, among other things, that Med Cap needed audited financials.  RTA's report warned that Med Cap could use investor proceeds to pay interest payments—the hallmark of every Ponzi scheme since Ponzi himself.  Yet Securities America said nothing about this to its brokers or its customers, and that is exactly what Med Cap was doing even in January 2005 when RTA sounded the warning: using investor proceeds to pay dividends.

111.    Mick & Associates also urged that additional disclosures be made via a Client Disclosure Form.  Securities America failed to reasonably act on information that Mick & Associates provided regarding the full measure of risks associated with promissory notes issued by Med Cap's various SPC's.

112.    Additionally, Securities America withheld material risk information from investors.

113.    Year after year, Mick & Associates, retained to conduct a review of the various Med Cap offerings, specifically requested and, at many times, pleaded that investors be informed of certain heightened risks. Securities America refused.  Later, at his deposition, Securities America's Head of Sales and Due Diligence Committee Chairman, Thomas Cross would testify that giving investors due diligence reports "would be a bad thing."

114.    Securities America, in the exercise of reasonable due diligence, when made aware that Med Cap II's, IV's, and V's accounting practices and records keeping did not comply with or facilitate GAAP-compliant accounting, should have at least demanded to see some source of back-up documentation, *e.g.*, bank statements, tax returns, etc., for Med Cap's and the various SPCs' representations about their solvency and profitability.  In fact, Securities America's due diligence advisors urged Securities America to review payments to investors by looking at such things as checks and other source documentation.  But Securities America refused.

115.    Securities America utterly rejected advice from Securities America's own due diligence advisors, and that rejection is both the factual and proximate cause of the financial loss suffered by Zinner and all members of the putative class.  Securities America's due diligence discovered that Med Cap II's, IV's, and V's financial affairs, internal controls, and accounting pointed towards a Ponzi scheme, but Securities America negligently failed to disclose this to the Zinner or to any member of the putative class, which is the factual and proximate cause of the financial loss suffered by Zinner and all members of the putative class.

116.    Nowhere is Securities America's negligence more clear than in Securities America's failure to adhere to FINRA's Notice to Members 03-71.  *See* Exhibit O (FINRA Not. To Members 03-71).  This notice imposes upon FINRA members like Securities America due diligence obligations when selling products like the Med Cap notes at issue here.  In so doing, this Notice establishes a standard of care that Securities America should have (but did not) follow.

117.     Among other things, Notice 03-71 requires members like Securities America to "provide a balanced disclosure of both risks and rewards associated with a particular product[.]" (Exhibit O at 1).  This, Securities America's materials did not do.

118.     Additionally, Notice 03-71 requires members like Securities America to "understand" some "common features of products like Med Cap's notes, including the "creditworthiness of the issuer" and the "creditworthiness and value of any underlying collateral." (Exhibit O at 3).  Securities America  failed here as well.  Contrary to what Securities America, by omission, led investors to believe, Med Cap was not at all creditworthy, and the underlying collateral, *i.e.*, medical receivables, was greatly overvalued, as explained in the S.E.C. Receiver's reports on Med Cap.

119.     While Notice 03-71 allows members to "in good faith rely on representations . . . contained in a prospectus or disclosure document," (Exhibit O at 4), the notice cautions that such reliance "may not be sufficient for a member to satisfy its due diligence requirements *where the content of the prospectus or disclosure document does not provide the member with sufficient information to fully evaluate the risk of the product*[.]" (Exhibit Q at 4) (Emphasis added).

120.     Regarding Med Cap, there is little doubt that the PPMs did not provide Securities America with sufficient information to fully evaluate the risk of notes issued by Med Cap.  That much should have been clear to Securities America given the lack of audited financials.  That much certainly was clear in the light of due diligence performed by third parties and made available to Securities America—due diligence that amply and repeatedly warned Securities America that, for example, Med Cap might use offering proceeds to pay interest.

121.    Indeed, as Notice 03-71 warned members in 2003, "simply providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or promotional materials, whether prepared by member . . . or issuer." (Exhibit O at 5).

122.    As the notice instructs, when a PPM does not contain enough information, the member must undertake due diligence. Here, that is just what happened, but here, the due diligence heralded all the warning signs of a classic Ponzi scheme. Yet, Securities America cast aside the due diligence and concluded that the notes were appropriate for sale without disclosing additional and material risks that third-party due diligence uncovered.

123.    Because Securities America withheld from its brokers and its customers the Mick & Associates' and RTA's due diligence reports, Securities America, by omission, led investors to believe that Med Cap notes offered protection against declining markets, because of the purported collateral that allegedly backed the notes. Those statements, however, were neither fair nor accurate, in violation of Notice 03-71.

124.    Nowhere is this more apparent than the letters that Med Cap sent out as their Ponzi schemes started to unravel. The letters blamed declining markets as the reason Med Cap could not redeem notes or pay interest. Contrary to what Securities America told investors, the collateral, which was overvalued in the first place, offered investors no protection whatever against declining markets.

125.    Obviously, Securities America failed to "train registered persons [*i.e.*, the broker] about the . . . risks" of Med Cap notes before Securities America allowed the broker to sell said notes to investors. This failure violated Notice 03-71 and provides still more evidence that Securities America acted negligently because, as the notice

38

requires, "members must ensure that they implement appropriate supervisory internal controls and appropriate training to all registered persons who sell such products to customers." (Exhibit O at 6). Clearly, Securities America did not do that.

## COUNT FOUR—NEGLIGENT MISREPRESENTATION

### Against Defendant Securities America, Inc. only

126.    Plaintiffs here incorporates by reference the allegations made in paragraphs 1 through 91, as if fully here alleged.

127.    Securities America negligently omitted to disclose Zinner and to all members of the putative class that Securities America had conducted adequate due diligence, that Securities America's due diligence advisors had learned of the problems, but Securities America failed to disclose the problems, their risks or implications to the Zinner or to any member of the putative class. And Securities America did so over the objection of its due diligence advisors Mick & Associates and RTA.

128.    Securities America negligently omitted to disclose to Zinner and all members of the putative class that Med Cap II, IV, and V were nothing more than just another Ponzi scheme.

129.    Securities America's negligent omissions were substantially the same to Zinner and all putative class members. These negligent misrepresentations were made regarding the profitability and promise of investing in Med Cap II, IV, and V notes via the misleading omissions in Med Cap II, IV, and V PPMs that Securities America circulated to Zinner and members of the putative class.

130.    Zinner and all members of the putative class justifiably relied on Securities America's negligent omissions, and such reliance can be presumed from this

39

common scheme.

131.    Securities America's negligent omissions caused Zinner and the putative class members to suffer great financial harm.

## PRAYER FOR RELIEF

**WHEREFORE,** Zinner prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Zinner as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.      Awarding Zinner and the Class compensatory damages for Securities America's violation of § 8-1102(1)(b), (c) of the Securities Act of Nebraska ;

C.      Awarding Zinner and the Class compensatory damages for Securities America's negligence flouting Notice to Members 03-71 when Securities America rejected the warnings from Mick & Associates & RTA;

D.      Awarding Zinner and the Class compensatory damages for Securities America's negligent omissions;

E.      Awarding Zinner and the Class compensatory damages against Defendants SAFC and Ameriprise for their direct or indirect control of Defendant Securities America and because both materially aided Securities America's violation of the Securities Act of Nebraska;

F.      Awarding Zinner and the Class pre-judgment interest, as well as dividends or interest promised but not paid;

G.      Awarding Zinner and the Class their reasonable costs and expenses incurred in this action, attorney's fees under the Securities Act of Nebraska, a reasonable bounty for the Class Representative, and expert witness fees; and

H.      Granting other such relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Zinner hereby demands a trial by jury on all issues.

DATED:  March 10, 2010

/s/ Gail Boliver
Gail Boliver
Nebraska Bar No.20593
boliver@marshallnet.com
BOLIVER & BIDWELL
8712 Dodge Road, Suite 400
Omaha, NE  68114
(888)738-7816
(402) 392-1011 (facsimile)

Jeffrey R. Sonn*
Florida Bar No. 773514
jsonn@sonnerez.com
Scott L. Adkins*
California Bar No.  194809
sadkins@sonnerez.com
SONN & EREZ, PLC
500 East Broward Blvd., Suite 1600
Fort Lauderdale, FL  33394
(954) 763-4700
(954) 763-1866 (facsimile)

* *pro hac vice* motions to be filed